## JUNE TERM, 1867.

### B. M. Bradford *v.* E. Jenkins *et al.*

1. SLAVES: CONSTRUCTION OF WARRANTY "SLAVES FOR LIFE."—A covenant in a bill of sale of slaves, that the slaves are slaves for life, relates to the status of the slaves at the time of the sale, and is fulfilled, if the slaves were, by the existing laws, in a condition which rendered them liable to servitude for the period of their lives. The covenant is not broken, if the slaves are subsequently emancipated by the act of the government.

2. PROPERTY HELD SUBJECT TO ACTION OF GOVERNMENT.—Every owner of property holds the same subject to such action as the sovereign power of the State may, in the exercise of its ultimate sovereignty, adopt in relation to it.

3. CONTRACTS LAWFUL WHEN ENTERED INTO, AND SUBSEQUENTLY MADE UNLAWFUL BY ACT OF THE LEGISLATURE.—If one agrees to do a thing, which it is lawful for him to do, and it becomes unlawful by an act of the legislature, the act avoids the promise. This principle has no application to a sale of slaves, where the title had passed before the act of emancipation; it applies where the contract is executory, and the seller had not parted with the title to the property, but had only bound himself to make title at some future period.

4. SLAVES: EMANCIPATION OF: ORDINANCE OF CONVENTION ABOLISHING SLAVERY, PROSPECTIVE.—The provision in the ordinance of the convention of August, 1865, abolishing slavery in the State of Mississippi, is prospective in its operation, and does not affect rights vested by lawful contracts.

5. TRUSTS AND TRUSTEES: APPOINTMENT OF A NEW TRUSTEE.—The appointment of a new trustee, when made in accordance with the power conferred in the trust deed, is valid, and vests the appointee with all the powers of the original trustee.

APPEAL from the Chancery Court of Monroe county. Hon. W. H. Kilpatrick, judge.

In January, 1857, Bradford purchased from Jenkins a plantation in Choctaw county, mules, corn, farming implements, and one hundred and thirteen slaves, for the sum of $122,000; in the purchase the slaves were estimated at $93,000, the land at $22,000, and the mules, etc., at $7,000. A deed in fee simple was executed by Jenkins for the land, and a bill of sale for the slaves, who are warranted to be slaves for life. Bradford paid $30,000 in cash, and gave his four promissory notes, due January, 1858, 1859, 1860, and 1861, for the balance of the purchase-money, and to secure their payment executed a deed of trust to R. D. Hayden, conveying the property purchased and certain land in the county of Monroe. The trust deed provides that, upon default of payment of any of the notes, the property may be sold for cash.

Bradford, subsequent to the purchase, paid the sum of $53,000, and in 1865, after the surrender, reconveyed the land purchased to Jenkins for the originally estimated value, $22,000. The payments amount in the aggregate to the sum of $105,000.

In 1861 or 1862, Bradford offered to pay Jenkins the balance due him in Tennessee Bank notes, which were at the time at a small discount; which were refused. In 1862, Bradford wrote to Jenkins, foreshadowing what would be the result if the South failed in the war, and pressed him to allow the negroes to be sold, which he refused.

Hayden resigned as trustee, and Christian was appointed a new trustee, according to the requirements of the trust deed. In 1866, Christian advertised the land, situated in Monroe county and conveyed in the trust deed, for sale. Bradford filed his bill in chancery for the purpose of enjoining the sale. The bill states the facts heretofore recited, and, in addition, that he had purchased the slaves, not for the purpose of sale, but as an investment; that most of them were young and their labor unproductive. The prayer is for an account to be taken and stated between the parties, that Bradford be charged with the hire of the slaves; that Jenkins, with the value of those set free and for general relief. The answer of Jenkins admits the

facts as stated in the bill respecting the purchase, the warranty, the payments, and the trust deed.

On motion of appellee, the injunction was dissolved, and the bill dismissed in the Court below.   From this decree Bradford appealed to this court.

*Houston & Reynolds,* for appellants, contended:

1. That it is urged for appellees, that, if the warranty relates to the future status of the slaves, he is relieved therefrom by the act of the government in emancipating the slaves.   That the principle is, " that the act of the government hurts no man."   That this maxim, if applicable to the vendor, applies as well to the vendee.   That if the vendor could not have contemplated the freeing of the slaves, and therefore did not intend to warrant against it, so the vendee did not contemplate paying for anything but slaves for life, and should not be compelled to pay for anything but " slaves for life."

2. That the loss of emancipation must fall, either upon the vendor or vendee, and it is just that it should fall where the parties by the terms of their own voluntary contracts have fixed it. Let each stand by his covenant, and if the action of the government must operate hardly on the one or the other, let him suffer who hath not protected himself by the proper terms, conditions, and exceptions in his contract.

3. That at the time the sale was made, Jenkins and Bradford both believed that the one was selling and the other purchasing slaves for life, that is slaves during their lives.   This was the understanding of the parties at the time ; this was the consideration for which Bradford paid his money and gave his notes. What would be the form and expression to be used in a contract to carry out or express the understanding of the contracting parties ?   It would be for Jenkins, in his bill of sale of the slaves, to warrant them to be "slaves for life."   This is the exact language of the covenant, of which a breach is complained of, and if we interpret it according to the understanding of the contracting parties at the time it was made, it relates not alone to their status of slaves at the time of the sale, but during the

period of their lives.    It was a warranty that the slaves would be slaves for life, during life.

"Where the law creates a duty or charge, and the party is disabled from performing it without any default in him, and he has no remedy over, the law will excuse him; but where the party by his own contract creates a duty or charge upon himself, he is bound to make it good, because he might have provided against it in his contract. *Paradine* v. *Gayne*, Alleyn, 27; *Abby* v. *Bellups*, 35 Miss. 618; Story on Bailments, § 36; Abbot on Shipping, ch. 1, §§ 14, 16; ch. 7, §§ 17-19; 6 Dunf. & East, 650, 750; *Philips* v. *Stephen*, 16 Mass. R. 238; *Fowler* v. *Botts*, 6 ib. 63; Chitty on Contracts, 630-1; 2 Story's Equity Jur. §§ 1303-1311; *Harrison* v. *Monell*, 5 B. Mon. 359; *Perry* v. *Hulett*, 5 Porter R. 218, 8 ib. 133, 9 ib. 72; 9 Yerger, 45; 11 Georgia, 110; *Hanna* v. *Fleming*, 25 Miss. R. 135.

4. That the language of the warranty shows that it did not relate alone to the status of the slaves at the time of the sale. When we say, that a slave is a slave for life, do we mean that he is a slave now, and may be a free man the next hour? To be a slave for life is equivalent to being a slave during life, all of life.

When we say, that a person is an invalid or cripple for life, do we mean that his present condition is that of an invalid or cripple only? Do we not mean, that he is now an invalid or cripple, and that this condition will continue during life. The same construction will be put upon the expressions, "maimed for life," "imprisoned for life," or "sound in body and mind for life." And by a parity of reasoning, when we warrant slaves "to be slaves for life," we warrant their existing and future condition.

5. That there was mutual error and surprise of the parties in reference to the facts upon which they based their contract. It was the settled opinion and belief of both, that the negroes were and would continue to be slaves for life. This was mutual error, and under circumstances material to the character and consequence of the transaction; in such cases, equity will interpose and relieve the parties from the contract. 1 Story's Equity, § 134; 16 Vesey, 72-81.

Equity will give relief, where the subject matter of a sale and purchase is so materially variant from what the parties supposed it to be, that the substantial object of the sale and purchase entirely fails.   Hilliard's Eq. J. 69, § 2.

6. That equity will grant relief in cases of accident, and by the term accident is here intended, not merely inevitable casualty or the act of providence, or what is technically called "*vis major*," but such unforeseen events, misfortunes, losses, acts or omissions as are not the result of any negligence or misconduct in either party.   1 Story's Equity J., § 78.   *Sample* v. *Pickens et. al.*, 1 Sm. & M. Ch. R. 506-507.

7. That by the deed of trust the legal title to the property conveyed was in R. D. Hayden, the original trustee.   That upon his resignation the deed empowers Jenkins to appoint a new trustee, but this does not clothe the new trustee, Christian, with the legal title, without a conveyance from Hayden.   That to clothe Christian with the legal title there must be a conveyance from Hayden.   Hill on Trustees, 185, 186, 187, 188; Sugden on Powers, 500, 501, 502.

*Christian & Sykes*, for appellees, contended :

1. That the deed of trust authorized the appointment of a trustee upon the resignation of Hayden, and the trustee so appointed should be with all the powers and rights of the original trustee.   Upon the resignation of Hayden and the appointment of Christian, the powers of Hayden and the legal title to the property were vested in the appointee. It was not necessary that Hayden should convey.   1 S. & M. Ch. 207 ; *Foster* v. *Goree*, 4 Ala. R. 441.

2. The notes which are secured by the trust deed were given for land, mules, provisions, and slaves.   The balance due, about $40,000, is not more than the mules, corn and provisions were valued at the time of the purchase ; and if the notes for the negroes are not collectible, yet the trust may be enforced for the payment of the debt for the mules, corn and provisions.

3. That the warranty of the slaves is in the present tense, and relates to the condition of the slaves at the time the war·

ranty was made. Suppose a warranty that the slaves are sound in body and in mind, would it be contended that it referred to the future mental and physical condition of the slaves? It is manifest that it refers to their condition at the time of the sale.

4. "All deeds must be construed agreeably to the intent of the parties," and "it must be presumed that the parties had in view evictions, entries, or disturbances, to be made by virtue only of existing rights, and not of rights afterwards to be acquired; for these, it cannot be presumed, were contemplated by the parties to the covenant." *Ellis* v. *Welsh*, 6 Mass. 250.

"All warranties, however expressed, are to be construed according to surrounding circumstances, and the general character of the transaction, and the established usage in similar cases, as will make the engagement of warranty conform to the intention and understanding of the parties." 1 Parsons on Cont. 459.

Did the parties contemplate a warranty of the title in this case against the action of the government? Certainly not, no human foresight contemplated the events that have transpired. The warranty can only be construed as warranting the then existing condition of the slaves, and not against what might occur.

5. The warranty is not prospective; it is not to do or forbear to do anything. It is like a warranty of title to land. In such a case, the warranty relates to defects in the title existing at the time of the warranty. If the government should confiscate the land, and dispossess the grantee, the warranty would not be broken.

6. That at the time of the sale the slaves were mere chattel property, subject to be bought and sold, transferred and assigned (1 Stew. 320). The government has destroyed all rights of property in slaves, without the appellee having any part or lot in the matter. If the appellee had warranted them to be slaves for life and so to remain, the action of the government would repeal the covenant and exonerate him from liability. 1 Salk. 198; *Presbyterian Church* v. *City of New York*, 5 Cowen, 538.

7. That Bradford cannot take advantage of his own default.

His notes were due before the emancipation of the slaves, and his own default is made the foundation of his complaint in this cause.    If he had paid at maturity he would have obtained that for which his counsel contend he contracted, "slaves for life."

8. The Louisiana case commented upon, and insists dissenting opinion of the Chief-Justice should govern in this cause.

ELLETT, J., delivered the opinion of the court.

The bill in this case was filed by the appellant, in April 1866, to enjoin the sale of property under a deed of trust.    It is shown that the appellee sold and conveyed a large quantity of land, and a large number of slaves, to the appellant, on the 1st day of January, 1857, for a price to be paid partly in cash, and the residue in four equal annual instalments, the last of which was to be paid on the 1st of January, 1861. The land was conveyed by a warranty deed, and the slaves by a separate bill of sale of the same date, by which the appellee, Jenkins, warranted "the title of the slaves against the claim or claims of any and all persons whatsoever, and that the same are slaves for life." The same land and slaves were, on the same day, conveyed by Bradford to R. D. Hayden as trustee, to secure the deferred payments of the purchase-money, with a power of sale on default of payment.

The main ground relied on in the bill for relief, is, that the slaves were warranted to be slaves for life, and that they have since been emancipated by act of the sovereign power of the State, and have ceased to be slaves for life, and that the consideration of the note remaining unpaid has thereby failed.

A motion to dissolve the injunction on bill and answer, was sustained by the court below, and the complainant appeals to this court.

It is contended, in the first place, that the warranty of title to the slaves has been broken by their subsequent emancipation. This proceeds on the idea that the warranty that the slaves " are slaves for life," means, in legal contemplation, that they shall continue to be slaves during the term of their natural lives.    We do not so understand the contract.    The warranty only under-

Bradford *v.* Jenkins et al.

takes to guarantee the status of the slaves as slaves for life at the time of the sale, and the covenant is fulfilled if, at the time of the sale, the slaves were, by the then existing laws of the State, in a condition which rendered them liable to servitude for the period of their lives. The title of Jenkins to the slaves is not disputed, nor is it intimated that he was not the absolute owner of them, and fully authorized to convey them. By his covenant he only became liable for the condition of things as at the time of sale, and did not warrant that the policy of the government on the subject of negro slavery would never undergo a change. Every owner of property holds the same subject to such action as the sovereign power of the State may, in the exercise of its ultimate sovereignty, adopt in relation to it. The risk of such action was upon Jenkins as long as he was the owner of the slaves in question, and it passed to Bradford when they were transferred to him. The warranty is in the present tense, that the slaves " are slaves for life." To hold that this is a covenant that they will continue to be slaves for life, at any subsequent period, would be to engraft upon the contract of the party conditions and engagements to which he has never given his assent, and into which no sensible or prudent man would ever agree to enter. It might with as much force be argued, that the ordinary warranty of soundness will be broken, if the property should subsequently become unsound, as to hold the warranty of title to be broken by the subsequent emancipation of the slaves.

Again, it is contended that where a party agrees to do a thing which is lawful at the time, and it afterwards becomes unlawful by act of the legislature, the act avoids the promise, or, as it is expressed in some of the cases, "repeals the covenant." This is a familiar principle abundantly sustained by authority, but its application to the case before us is not perceived. Jenkins did not contract to do anything which was lawful at the time, but which it has since become unlawful for him to do. If his contract was executory; if he had not parted with the title to the property, but had only bound himself to make title at a future period, the doctrine invoked would be applicable to the

case, and his obligation would be avoided or repealed; for it has now become unlawful and impossible to make a title to a negro as a slave. What effect this would have in such a case, depends very much upon considerations discussed in the case of *McMath* v. *Johnson* at the present term.

But here the contract of Jenkins has been fully executed. He made complete and valid conveyances of the land and slaves to Bradford, in January, 1857, at a time when it was perfectly lawful and proper for him to do so. He warranted that the negroes were slaves for life at that time, and it is not denied that they were so. Nothing remained to be done by him, and he is not now under any agreement to do any act which it has become unlawful for him to perform. He parted with his property, and the appellant received it, and held and enjoyed it for over eight years, when, in some one of those mutations of policy to which all people are subject, and which have occurred in so many countries besides ours, the government chose to sweep out of existence all rights of property in the subject-matter of a part of this contract. The plain rule of right and law, in such cases, is, that the loss must fall upon the party who is the owner at the time. This is the rule when the loss occurs by accidental or natural causes, and there is no reason why it should not apply when the loss is by the act of the sovereign power.

The contract of the purchaser to pay the purchase-money has not become one which it is unlawful or impossible for him to perform. The consideration of his promise has not failed, for he received all he contracted for—to wit, a good title to the property at the time of the sale; and he has had the enjoyment of it for several years. If he can now avoid the payment of the purchase-money, on the ground of failure of consideration, upon the same principle he might recover it back, if he had paid his notes at the time they severally fell due.

But again, it is insisted that it is against the present public policy of the State to enforce contracts based, in whole or in part, on the consideration of the sale of negroes as slaves, although such contracts contravened no law and no policy at the time they were made.

We admit that by the action of the convention August, 1865, abolishing slavery in this State, it has become unlawful to enter into any new contracts, since that date, founded on the idea of the existence of slavery as a lawful relation or *status*; but it is clear that before that date there was no law or policy that impaired the validity of such contracts. The provision incorporated in the constitution by the convention, recites that the institution of slavery has been destroyed in Mississippi, and it declares that " neither slavery nor involuntary servitude shall hereafter exist in this State." It is prospective in operation on the rights of property, and declares only the future policy of the State on the subject. Only such contracts come within the condemnation of this law, or its policy, as are entered into after its adoption, and which assumes the continued existence of the institution in the State. We cannot give to either a retrospective operation, so as to destroy rights vested by lawful contracts at a time when slavery was a cherished relation among us.

The views already expressed sufficiently answer other considerations presented in the argument, which it is unnecessary to examine in detail.

The case of *Cummings* v. *Parish*, 39 Miss. 412, disposes of the objection to the substitution of Christian as trustee.

Let the decree be affirmed.

Other cases involving the same defense, where the slaves were sold under an order of the Probate Court, by an administrator or executor, and where there was consequently no warranty of title, have been submitted to us, in which of course a similar decision is rendered.